**UNITED STATES of America**

v.

**Albert STARK.**

**UNITED STATES of America**

v.

**Harry BART.**
**Crim. A. Nos. 22813, 22814.**

United States District Court
D. Maryland, Criminal Division.
April 18, 1955.

On November 24, 1953 Albert Stark was indicted for alleged violation of section 1001 of title 18 U.S.C. The indictment in two counts in substance alleged that Albert Stark and Harry Bart were on and previously to December 6, 1952, engaged jointly in the construction of projects financed by mortgages insured by the Federal Housing Administration, and subject to continuing FHA inspection during the period of construction, in compliance with FHA approved plans and specifications; that Lindian J. Swaim and E. Lawrence Hyland were Special Agents of the Federal Bureau of Investigation lawfully detailed by the FBI to investigate irregularities and misconduct of officers and employees of the United States employed in the Baltimore insuring office of the FHA, and were lawfully detailed to investigate frauds on and attempts to defraud the Government in the functioning of the Maryland office of the FHA, all matters within the jurisdiction of the FBI, an agency of the United States; that the defendant took an oath before said Agents and thereafter knowingly and willfully made false statements material to the investigation, to wit, that he had never made any payment of money or given anything of value to any employee or official of the FHA for any reason whatsoever (with immaterial exceptions); and further that he had no knowledge of any one else making payments or giving things of value to FHA employees or officials, for which there had been no reimbursement, whereas in fact said statements were false and fictitious and were then known by the defendant to be false and fictitious; and that said defendant further stated that he had no knowledge of the payment of $500 to one Harry House, an FHA Inspector, nor any knowledge of a return of said amount by mail by the said Harry House of the sum of $500 to Harry Bart or to the defendant, whereas in fact said statements were false and fictitious as then known to the defendant.

George Cochran Doub, U. S. Atty., Herbert F. Murray, Asst. U. S. Atty., Baltimore, Md., for plaintiffs.

William D. Macmillan, Semmes, Bowen & Semmes, Paul Berman, Baltimore, Md., for defendants.

CHESNUT, District Judge.

The questions now before the court require the construction of title 18, § 1001, United States Code, with respect to its application to the factual situation arising in these cases, which are substantially identical in subject matter. For brevity it will be sufficient to refer to No. 22813, as the procedure involved in the questions raised are identical with case No. 22814.

Section 1001 reads as follows:

"Whoever, in any *matter within the jurisdiction of any department*

*or agency* of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a *material fact,* or makes any false, fictitious or fraudulent *statements or representations,* or makes or uses any *false writing or document* knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both." (Italics supplied.)

There have been the following prior proceedings in this case. The indictment was filed November 24, 1953. On February 5, 1954, after hearing argument of counsel, defendants' motion to dismiss the indictment was overruled. On November 10, 1954 defendants filed another motion to dismiss the indictment, with numerous exhibits, to which there was an answer by the United States. This second motion to dismiss was based on alleged prejudice to the defendant by reason of newspaper publicity which had locally been given to proceedings at a Congressional inquiry upon the subject of federal housing at which the defendant had been summoned to appear and testify as a witness. After extended hearing of counsel the court rendered an oral opinion on December 6, 1954, overruling this second motion to dismiss the indictment; but on the condition that the trial should be postponed for a period of several months. Shortly thereafter counsel for the parties entered into a stipulation that there should be a preliminary trial by the court of certain special issues in advance of the trial of the general issue. The defendant waived a jury trial upon such special issues and agreed that the trial thereof should be by the court without a jury. It was agreed that at the preliminary trial the court should decide the issue of the applicability of title 18, § 1001, to the circumstances of the alleged false statements charged against the defendant and should make special findings upon the following questions.

a. Is the Federal Bureau of Investigation a "department or agency" within the meaning of title 18 U.S.C. § 1001, which forbids making false statements material "in any matter within the jurisdiction of any department or agency of the United States".

b. Is the Department of Justice a "department or agency" within the meaning of title 18 U.S.C. § 1001, which forbids making false statements material "in any matter within the jurisdiction of any department or agency of the United States".

c. Was there a "matter", as that term is used in title 18 U.S.C. § 1001, in which the alleged false statements were made.

d. If there was "such a matter", was it within the jurisdiction of the Federal Bureau of Investigation at the time the alleged statements were made.

e. Were the alleged statements of the defendants material to the matter.

f. Were the alleged statements made in the matter allegedly within the jurisdiction of the Federal Bureau of Investigation.

g. Were the Special Agents of the Federal Bureau of Investigation, to whom each defendant is alleged to have made said false statements, lawfully detailed to make the investigation set forth in the indictment.

The stipulation further provided that upon the trial of the general issue the special issues preliminarily decided should not be submitted for re-determination by the jury and that the jury trial should be limited to the issues of (a) whether or not the statements charged in the indictment were actually made by the defendant, and (b) if so, whether they are true or false and (c) any other issues of fact that may arise in the trial of the case except those determined by the court on the preliminary trial; and at the trial of the general issue the court should instruct the jury in accordance with its special findings upon the preliminary trial of the special issues without, however, any waiver of the right of the United States or the respective defendants to except to the correctness of such instructions and to appeal therefrom; and

that at the jury trial either party may introduce in evidence a transcript of the testimony taken at the preliminary trial of the special issues; and that the stipulation was without prejudice to the rights of the parties to challenge on appeal the action of the court on the questions decided by it without a jury.

Pursuant to the stipulation some oral testimony has been taken and some documentary exhibits filed. From the oral testimony I find that shortly before December 6, 1952 the Baltimore office of the FBI received confidential information to the effect that one or more officials of the Baltimore office of the FHA had been bribed, or an attempt had been made to bribe them, in the performance of their duties in the proper administration of the Baltimore office of the FHA in particular relation to the supervision of inspection of building projects being constructed by Stark & Bart, and insured or to be insured by the FHA. In consequence of this information the manager of the Baltimore office of the FBI instructed Special Agents Swaim and Hyland to investigate the matter and they, on December 6, 1952, went to the business office of Bart & Stark and interviewed them separately and respectively upon the subject to their knowledge of such bribery or attempted bribery. The Agents informed the defendants of their constitutional rights with respect to answering questions or refusing to do so, and that any answers given by them might possibly thereafter be used against them in a criminal proceeding. The defendants willingly agreed to answer questions to be put to them by the Agents and each respectively and separately took an oath to answer the questions truthfully. Thereupon the defendants gave the answers and made the statements alleged in the indictments, according to the testimony of the Agents. The defendants were not asked to and did not sign any written statement. It appears that they did not volunteer or take the initiative in giving information but only answered questions put to them.

Thereafter on April 7, 1953 Harry Bart, Albert Stark, J. Hamilton Walker and Raymond M. Miskimon were indicted by the Grand Jury for the Maryland District on six counts. In the first count Bart & Stark were charged with bribery of a named official of the Baltimore FHA office; in the second and third counts Bart, and in the fourth count Stark, were charged with committing perjury. After hearing counsel the court dismissed the indictment on the ground of misjoinder of offenses and defendants. The present indictments were filed on November 24, 1953.

I further find from the oral testimony that after receiving the confidential information above referred to, the Baltimore office of the FBI opened a special file for the investigation of the particular matter entitled "Bribery and Fraud on the Government". A written report was promptly submitted to the central office of the FBI in the Department of Justice in Washington; and the investigation of the subject matter continued to be made by the Baltimore office for some time thereafter, with current reports to Washington upon the subject and without objection from the Washington office to continuation of the investigation and without instructions to discontinue it, and in consequence of the investigation the present indictments were filed. But I also find from the oral testimony that the Department of Justice and the several branches of the FBI in various localities of the United States were generally authorized to and did make investigations as to bribery of officials of the United States and frauds or attempted frauds on the United States without special instructions from Washington as to particular matters so investigated; and that in general the local office of the FBI did have authority from the Federal Bureau of Investigation, a department of the Department of Justice, to make such investigations.

In connection with the matters and questions submitted by the stipulation and after consideration of the oral testi-

mony and the exhibits heretofore referred to (which latter will be hereafter more particularly mentioned) the court heard extensive oral arguments of counsel on the subject and has considered in connection therewith their extensive and elaborate briefs submitted by respective counsel.

Two important and dominant questions were fully discussed and have been considered by the court. One is whether the Baltimore office of the FBI was duly authorized to make the investigation of the alleged bribery or attempts to bribe officials of the Baltimore office of the FHA; and the other is whether the answers allegedly made by the defendants constituted "statements" in a "matter within the jurisdiction" of the FBI, within the meaning of section 1001.

 As to the first question, I have little or no difficulty. The Federal Bureau of Investigation is a branch or special department or agency of the Department of Justice which, of course, is one of the most important branches of the Government and is generally charged with the investigation and prosecution of alleged crimes against the United States, unless otherwise provided by other legislation. The Department of Justice is, of course, under the supervision of the Attorney General of the United States, which office was first created by the Act of September 24, 1789, c. 20, § 35, 1 Stat. 92. See also the Act of June 22, 1870, c. 150, § 1, 16 Stat. 162, which established the Department of Justice and the Attorney General as the head thereof. 5 U.S.C.A. § 291. See also opinion of Attorney General Cushing, 6 Op.Atty.Gen. 326, 1854. By section 299 of 5 U.S.C.A. the Attorney General was authorized to appoint officials who should be vested with the authority necessary for the investigation regarding official matters under the control of the Department of Justice; and the Attorney General has been authorized to appoint officials who should be vested with the authority necessary for the execution of duties with respect to the detection and prosecution of crimes against the United States. See Act of

March 1, 1921, c. 89, § 1, 41 Stat. 1175, et seq., and 5 U.S.C.A. § 300.

The Federal Bureau of Investigation was first established by the Attorney General in 1908 as set forth in a letter from the Attorney General, to Senator Forrest C. Donnell dated May 27, 1948. The Director of the Federal Bureau of Investigation was first appointed by the Attorney General in 1924 and he reports directly to the Attorney General. It is well known that the FBI has for many years been acting as a part of the Department of Justice in the investigation and detection of crimes against the United States except where such duties have been specially committed to other Departments, as in the case of frauds on the Internal Revenue Department, narcotic law violations and immigration and naturalization matters. It is a branch of the Department of Justice and is within the definition of an agency of the United States under section 6 of title 18 U.S.C. By the recent Act of Congress dated August 31, 1954, § 311a, title 5, U.S.C.A., the powers and duties of the Federal Bureau of Investigation were further extended to include investigation of some particular criminal offenses which theretofore had been otherwise specially delegated by law to other Departments of the Government, and were to cover generally investigation of offenses not specifically delegated to other Agencies.

The defendants' contention that the Baltimore branch of the FBI did not have proper authority to investigate the alleged bribery of officials in the Baltimore office of the FHA is based on their interpretation of certain correspondence between the office of the Attorney General and the office of the Federal Housing Administration with respect to matters relating to irregularities or offenses arising in the administration of the FHA Agency. This correspondence has been filed as exhibits in the case. To understand their meaning and effect reference should be made to the provisions of the Act of June 27, 1934 creating the Housing Act, 12 U.S.C.A. § 1701 et seq. Section 1731 provides penalties for various

offenses in the administration of the Housing Act. So far as this case is concerned the provisions of section 1731 are in substance now contained in 18 U.S.C. § 1010.

Prior to May 23, 1935 there was some correspondence betweeen the legal department of the FHA and the office of the Attorney General with respect to who should initiate investigations of irregularities of offenses in the administration of the FHA. On the latter date an attorney in the Collection Department of the FHA wrote to an attorney in the Criminal Division of the Department of Justice stating that as a result of several conferences relative to the proper presentation of matters to be handled by the Department of Justice it was the understanding of the FHA that the Department of Justice wishes the FHA "to make full investigation securing all possible evidence and information regarding each case before presenting it to you. It is also understood that you will consider the recommendations of this office regarding action by your Department".

On May 5, 1935 the then Attorney General Homer Cummings issued a department circular No. 2694 addressed to United States Attorneys in which he called attention to the provision of the National Housing Act, §§ 1702–1732 of title 12 U.S.C.A. in which it was stated that:

"Arrangements have been made with the Federal Housing Administration to have all complaints savoring of a criminal character submitted direct to this (Justice) Department for consideration, and in instances where prosecution is believed to be warranted under any federal criminal statute the matter will be taken up by the Department with the appropriate United States Attorney.

"If complaints of the above character are submitted to your office from any other source, it is requested that such complaints be immediately referred to the Collection Section of the Federal Housing Administration, Washington, D. C. for investigation and appropriate attention."

On June 30, 1936 the Honorable Stanley Reed, then Acting Attorney General, wrote an opinion to the Secretary of the Interior with regard to the jurisdiction of the Department of Justice or of the Treasury Department, respectively, to investigate or make arrests in certain matters arising under the Federal Reserve Act, 12 U.S.C.A. § 221 et seq., and the Federal Deposit Insurance Act, 12 U.S.C.A. § 264, which was to the effect that particular provisions in those Acts gave jurisdiction with respect to criminal offenses to the Secret Service or other Agents of the Treasury Department, but explaining that with respect to offenses punishable under section 5209 of the Revised Statutes relating directly to banks, the FBI had and would exercise authority.

Some years later (apparently before 1945) the Department of Justice Manual (which I understand was issued by the Department of Justice for guidance of United States Attorneys) referred to investigations and prosecutions under section 1731 of title 12, Federal Housing Act, and stated that—

"All cases arising under this statute are investigated by the Federal Housing Authority Investigation Section. The Federal Housing Administration submits to this Department its report of investigation and recommends that criminal proceedings be instituted. The report is reviewed by this Department and if prosecution is considered warranted, it is forwarded to the proper United States Attorney for prosecutive action."

In the United States Attorneys Manual, issued by the Department of Justice, the organization and authorized activities of the Federal Bureau of Investigation is set out at some length. It is stated therein that reports of investigations are supervised at the seat of Government in Washington, D. C., for the specific purpose of effecting coordination on a nation-wide basis, disseminating

reports to the government agencies having appropriate official interest, and aiding in giving direction to the investigative activities in the field services.

"There are 52 field offices of the FBI located throughout the United States and including field offices at San Juan, Puerto Rico; Anchorage, Alaska, and Honolulu, Hawaii. These offices are established at locations depending upon the volume of work and the requirements for supervision.

"In charge of each of the field offices is an experienced Special Agent with the title of Special Agent in Charge. He is responsible for all FBI operations in the field division in which his office is located. There is also an Assistant Special Agent in Charge of each field office, and when the volume of work justifies, there are one or more field supervisors to assist in the handling of the administrative duties within each field division."

The Manual continues:

"The FBI is charged with investigating violations of the laws of the United States and collecting evidence in cases in which the United States is or may be a party in interest. Although this gives broad jurisdiction in matters of federal interest by administrative order of the Attorney General, the FBI does not investigate these matters which are specifically assigned by Congress to other federal investigating agencies."

The Manual then gives a long list of 50 or more special matters in which the FBI has investigative authority including therein the offenses of bribery and fraud on the Government.

As heretofore mentioned, offenses under section 1731 of title 12 U.S.C.A., the Federal Housing Act, were codified in 1948 by Act of Congress in principal part, so far as this case is concerned, into section 1010 of title 18 U.S.C., and apparently was one result of Congressional investigation of the administration of the Housing Act. Mr. Albert M. Cole,

then the Administrator of the Act, on April 12, 1954 wrote a letter to Attorney General Brownell reviewing the history of investigations of alleged criminal violations of the National Housing Act and referring to the inter-departmental arrangement in 1935 heretofore mentioned, to the effect that the FHA would make full investigation of all "complaints of alleged violations of criminal provisions of the National Housing Act and other original statutes growing out of the administration of the National Housing Act". The letter continued:

"Instructions to this effect were promulgated through Departmental Circular No. 2694 issued by the Attorney General to all United States Attorneys on June 5, 1935. Since the issuance of that circular investigation for violations of the Act have been made by the Federal Housing Administration. Complaints made to the FBI of this nature were usually referred to the FHA except in certain cases where it appeared that *violations of other criminal statutes might also be involved*. The FBI would complete the investigation of those cases." (Italics supplied.)

"The penalty provisions of the National Housing Act were repealed by the Act of June 25, 1948, but were re-enacted in Section 1010 of the revision of Title 18 of the Code which penalized the filing of a loan application containing false statements with the intent that the loan or credit be offered to or accepted by FHA for insurance. The case of Terry v. U. S., 8 Cir., 1942, 131 F.2d 40, held that false statements in FHA cases had to be prosecuted under the specific statute then in effect. Relying on the Terry decision it was thereafter concluded by the Department of Justice that Title 18, Section 1001, U.S.C., should not be utilized for criminal prosecution in this type of FHA matter, but that the specific statute, Title 18, Section 1010, be applied. The United States Attor-

neys have been so instructed by the Department of Justice in letters referring to particular FHA cases for prosecution, as well as in those cases where the FBI had undertaken investigation under 18 U.S.C. 1001. By memorandum of March 3, 1948, the Criminal Division of the Department advised the FBI: 'It has been held that where there are two statutes punishing the same offense, one being a specific statute and the other a general statute, the specific statute is controlling'. The FBI has repeatedly declined to investigate FHA loan offenses coming within the proscriptions of Section 1010, and when advised after receiving a complaint that 18 U.S.C. 1010 was applicable rather than 18 U.S.C. 1001, the Bureau has referred the matter to the Housing and Home Finance Agency for investigative attention."

"In the revision of the United States Attorneys Manual, Title 2, pages 73 and 74, instructions were incorporated to the effect that Federal Housing Administration violations submitted to United States Attorneys from any other source than the Department were to be referred to the General Counsel, Federal Housing Administration 'for investigation and appropriate attention'.

"I have become increasingly aware of the large number of frauds against the government which have been, and are being, perpetrated under the various FHA insurance programs. It appears that, in many cases, there can be prosecution only under Section 1010. In my opinion, there is no valid reason for drawing any distinction, as far as investigative jurisdiction is concerned, between violations of Section 1010 and other frauds against the government."

"It has also come to my attention that, by reason of the assumption of this criminal investigative jurisdiction by FHA, there have been instances where allegations involving possible criminal *violations* by FHA personnel have been investigated by FHA without referral to the FBI." (Italics supplied.)

The letter concluded by suggesting that the FBI should assume jurisdiction and initiate investigations under section 1010 as well as under section 1001.

In accordance with the request of the Housing Administrator, Attorney General Brownell on April 13, 1954 instructed J. Edgar Hoover, Director of the Federal Bureau of Investigation, to assume primary investigative jurisdiction in cases arising under section 1010 as well as under section 1001.

On August 12, 1954 in a letter from Mr. Warren Olney, 3rd, Assistant Attorney General, to Senator Byrd, relating to certain matters in the administration of the Federal Housing Act which has been under Congressional investigation, it was stated:

"You will note that the data and other information furnished in Federal Housing Administration matters referred to April 1954 as the point of comparison. You are aware, I am sure, that the Federal Bureau of Investigation on April 12, 1954, for the first time assumed primary jurisdiction of the investigation of all criminal matters arising from the operations of the Federal Housing Administration. Prior to that time, and since 1935 the Federal Housing Administration by an interagency agreement had primary jurisdiction of the investigation in Federal Housing Administration criminal matters."

From this review of the exhibits I think the conclusion is clear that in 1952, and indeed in the preceding years subsequent to the National Housing Act of 1934, the primary jurisdiction and authority to investigate alleged offenses involving bribery of officials of the FHA was in the FBI. The department correspondence which has been quoted was to the effect that to avoid overlapping jurisdiction of the FHA and the FBI, offenses arising under section 1731 of the Housing

Act (that is now section 1010 of title 18) should originally be investigated by the FHA and reported, if thought advisable, to the FBI; but on the other hand the primary investigative jurisdiction of offenses arising under section 1001 were always within the jurisdiction and authority for investigation by the FBI. I do not interpret any or all of the departmental correspondence or other exhibits reviewed above to mean or indeed imply that there was ever a restriction or limitation on the authority of the FBI to investigate charges of bribery relating to personnel of the FHA. It would seem quite unrealistic to infer that the correspondence was intended on the part of the Department of Justice to abrogate its otherwise undoubted authority to investigate such alleged criminal violations. It could hardly be supposed that the head of the FHA who might possibly have been involved would have had the full veto power to prevent investigations of charges affecting himself directly or which might very closely involve the administration by him or his Department. But however that may be, it is I think quite clear that at all times before and since 1935 the FBI has had full authority to investigate alleged bribery of federal officials and other incidents of fraud on the Government in general, except where specially delegated to other Departments by statutory enactment.

I have more difficulty with the second question—whether the factual situation here presented is within the scope and coverage of title 18, § 1001, and particularly whether the *answers* given by the defendants to the *questions asked* by the FBI Agents are "statements" within the meaning of that word as it appears in section 1001. Although the whole section is admirably concise in its wording, nevertheless some of the phrases therein are clearly inapplicable to the present situation. Omitting the latter, the section then reads:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully * * * makes

any false, fictitious or fraudulent statements * * * shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

It will be noted that the whole of section 1001 prohibits (1) falsifying, concealing or covering up by trick, scheme or device a *material fact;* (2) making any false, fictitious or fraudulent statements or representations and (3) making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry. As punctuated the word "material" modifying the word "fact" would seem not to be grammatically applicable to the second or third categories, but for the purpose of this opinion I will for the present assume that in the second category the false, fictitious or fraudulent statement or representation prohibited must also have been to a material matter.

With regard to the nature and character of the "statement" here involved it is to be noted (1) that it was not in writing; (2) it purported to have been given under oath; (3) it did not relate to any claim by or on behalf of the defendants against the United States or any department or agency thereof; (4) it was not made by the defendants to obtain or retain any official position or employment in any agency or department of the government and (5) possibly more importantly, was not initiated or volunteered by the defendants but was only an answer given in response to a particular inquiry.

Whether such a statement is within the meaning of the section required careful consideration of the statutory evolution of section 1001. This has been developed at great length and in great detail in an extended brief filed by counsel for the defendants in these cases but the subject matter has been much simplified and condensed in the very recent opinion of the Supreme Court in the case of United States v. Bramblett, 75 S.Ct. 504, 506, reversing the judgment of the United States District Court for the District of Columbia, reported in 120 F. Supp. 857. In the opinion by Mr. Justice Reed it was said:

"Section 1001 had its origin in a statute passed almost 100 years ago in the wake of a spate of frauds upon the Government. The Act of March 2, 1863, 12 Stat. 696, 'An Act to prevent and punish Frauds upon the Government of the United States', made it a criminal offense for

'any person in the land or naval forces of the United States * * * [to] make or cause to be made, or present or cause to be presented for payment or approval, to or by any person or officer in the civil or military service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent * * *.'

This provision clearly covers the presentation of false claims against any component of the Government to any officer of the Government. The prohibition of the statute is broad, although its application was limited to military personnel.

"False statements were proscribed in the following clause of the same section in these terms:

"'Any person in such forces or service who shall, for the purpose of obtaining, or aiding in obtaining, the approval or payment of such claim, make, use, or cause to be made or used, any false bill, receipt, voucher, entry, roll, account, claim, statement, certificate, affidavit, or deposition, knowing the same to contain any false or fraudulent *statement* or entry'. (Italics supplied.) * * *

"From 1863 to 1934 the coverage of the statute was at various times extended, but no change was made which could be or is taken by the appellee as restricting the scope of the false statements provision to the executive branch."

In a footnote to the opinion reference is made to various statutory changes made prior to 1934. In the Criminal Code Codification of 1909, 35 Stat. 1088,

the section became section 35. Section 35 was in turn revised in 1918, 40 Stat. 1015. The false claims provision was extended to cover corporations in which the United States held stock, and false statements were proscribed if made " 'for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States' ", as well as if made for the purpose of obtaining payment of a false claim.

The statute was again revised in 1934, 48 Stat. 996. No change was made in the false claims portion of the statute but the false statements section was amended to read:

" 'or whoever shall knowingly and willfully fasify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, *in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder; * * *.'* " (Italics supplied in opinion.)

"The amendment deleted all words as to purpose and inserted the italicized phrase. * * *

"Apparently the italicized phrase was inserted simply to compensate for the deleted language as to purpose—to indicate that not all falsifications, but only those made to Government organs were reached. * * *

"The 1934 revision was largely the product of the urging of the Secretary of the Interior. The Senate Report, S.Rep. No. 1202, 73d Cong., 2d Sess., indicates that its purpose was to broaden the statute so as to reach not only false papers presented in connection with a claim against the Government, but also nonmone-

tary frauds such as those involved in the 'hot-oil' shipments. A greater variety of false statements were meant to be included. \* \* \*

"The 1948 revision put the statute into its present form. 62 Stat. 683. The false claims provision became § 287 of Title 18 and retained its prior form without significant change. Section 1001 is the 'false statements' section. Except for housekeeping changes in language which are of no particular significance, the deletion of the reference to corporations, and the transposition of the 'in any matter' clause to the beginning of the section, there has been no change since the 1934 statute. There is no indication that the revision was intended to work any substantive change. \* \* \* "

From this condensed review of the statutory evolution of section 1001 it appears that prior to 1934 the statute proscribed (1) the making of false claims upon the United States and (2) the making of false statements to agencies of the United States in support of such claims for the purpose of defrauding the United States. In the 1948 revision of title 18 that portion of the original statutes relating to false claims has been rewritten as section 287 of title 18, while the false statements portion of the statutes prior to 1934, as amended in 1934, has become title 18, section 1001. But this division of the proscribed (1) false claims and (2) false statements, has not been materially changed in meaning and effect since the amendment of 1934. However, the effect of the 1934 Act was to eliminate from the prohibition of the statute the theretofore requirement that the false statement must have related to some monetary claim against the government. See the opinion in the Bramblett case.

In this connection it is to be noted that under the statute as it existed before 1934 there was still the requirement that the proscribed false statements must have related to some monetary matter affecting the government. It is pointed out in a note in the Bramblett case that—

"In United States v. Cohn, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616, the Court held that the 1918 Act did not proscribe false statements made to a customs collector where the purpose was not to defraud the Government of either its money or property. After the 1934 amendment, however, the Court sustained an indictment charging the defendants with willfully falsifying reports required to be filed under the 'Hot-Oil' Act of February 22, 1935, 15 U.S.C.A. § 715 et seq. The Court stated that the purpose of the 1934 amendment was to remove the prior 'restriction to cases involving pecuniary or property loss to the government.' United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522 [85 L.Ed. 598]."

In the Gilliland case the opinion of the Supreme Court by Chief Justice Hughes dealt with the application of section 35 of the Criminal Code as applied to written reports made to the Department of the Interior under the so-called "Hot-Oil" Act of 1935. This Act, together with the prescribed regulations, prohibited exportation from a State of a larger quantity of oil than was permitted by the State to be so exported, and required dealers to file periodic reports with the Interior Department of the amounts of oil exported from the State. Gilliland was indicted under section 35 as amended in 1934 for making false reports with respect to the amount of oil shipped from Texas. The District Court sustained a demurrer to the indictment on the ground that it did not state a case within the proper construction of section 35, because the false report did not relate to a matter affecting pecuniary or proprietary federal governmental matters. The Supreme Court reversed this holding principally on the ground that the 1934 Amendment of section 35 deleted the former requirement of the statute relating to financial interests of the United States. I think the case is quite important here because it seems clear enough that the false statements in the Gilliland reports would not have been within the coverage of section 35 prior to the 1934 amend-

ment. And I think it is equally clear that the statements of the defendants in this case likewise would not have been within the Act prior to 1934. The great importance of the Gilliland case, therefore, is the view taken by the Supreme Court with respect to the nature and effect of the 1934 amendment, because we find from the very recently decided Bramblett case that there has been no significant change in the purpose and effect of that part of section 35 now contained in section 1001, since the 1934 amendment. On pages 91–93 of 312 U.S., on page 521 of 61 S.Ct. of the Gilliland case the opinion said:

"Before the amendment of 1934, Section 35, after referring to the presentation of claims against the government which were known to be false or fraudulent, provided: 'or whoever, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, or for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry; * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both'."

The opinion then refers to the case of United States v. Cohn, 270 U.S. 339, 346, 347, 46 S.Ct. 251, 70 L.Ed. 616, where the court had held that the above language "should be construed 'as relating to the fraudulent causing of pecuniary or property loss' to the government. And that meaning was deemed to be emphasized by the context found in other provisions of Section 35."

The opinion in the Gilliland case then continues:

"The Act of June 18, 1934, amended Section 35 so that in place of the portion quoted above there was substituted these words: 'or whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder * * * shall be fined' etc.

"The amendment eliminated the words 'cheating and swindling' and broadened the provision so as to leave no adequate basis for the limited construction which had previously obtained. The statute was made to embrace false and fraudulent statements or representations where these were knowingly and willfully used in documents or affidavits 'in any matter within the jurisdiction of any department or agency of the United States'. In this, there was no restriction to cases involving pecuniary or property loss to the government. *The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described.* We see no reason why this apparent intention should be frustrated by construction." (Italics here supplied.)

I think it may be fairly derived from the Gilliland case that, while the false statements proscribed are not re-

quired to relate to the financial interests of the United States, nevertheless the kind of statements which are proscribed are those which necessarily have important relation to the protection of the authorized functions of the governmental departments and agencies from perversion which might result from this kind of deceptive practices which are prohibited.

The recently decided Bramblett case is not directly in point here because the false statement there involved was made in writing to the Disbursing Officer of the House of Representatives for a clerical allowance. The defendant's principal defense to the indictment under section 1001 was that the statute did not cover false statements in claims made to the legislative branch. This defense was overruled by the Supreme Court.

I now come to a consideration of the principal judicial decisions relating to the construction or application of Section 1001 since its original codification in 1948.

Counsel for the defendants place much reliance upon two cases in the 5th Circuit, one in 1950 and the other in 1953. United States v. Moore, 185 F.2d 92; Rolland v. United States, 200 F.2d 678. In both cases the alleged false statements (or concealments) were made to representatives of the Department of Labor acting under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., in relation to sums of money paid by the employer to employees. The defendants in both cases were indicted under section 1001. In the Moore case the indictment alleged that the statements were about matters within the jurisdiction of the Department of Labor but did not allege that the employer was engaged in interstate commerce. The District Judge had dismissed the indictment which, on appeal, was held sufficient although it was said that at a trial it would be necessary for the government to prove that the employer was engaged in interstate commerce, to bring the case within the jurisdiction of the Department.

In the Rolland case the indictment failed to allege that the alleged false statements were material. In that case the defendant's conviction on trial was reversed because the indictment did not allege the statements were material. In the Rolland case it appears that some of the statements were oral only while others were written, and in the Moore case it is not entirely clear whether the statements were oral or written. I do not think that either case deals with the situation that we have here although it is perhaps fair to say that the opinions in both cases at least imply that the trial court should be cautious in determining whether a given situation falls within the general language of section 1001. Certiorari was denied in the Rolland case, 345 U.S. 964, 73 S.Ct. 950, 97 L.Ed. 1383.

Counsel for the government places reliance on Marzani v. United States, 83 U.S.App.D.C. 78, 168 F.2d 133, opinion by Circuit Judge Prettyman. The case requires careful analysis. In 1942 Marzani applied for employment in the government service. In due course he was interrogated by representatives of the FBI and of the Civil Service Commission as to his qualifications and fitness for employment. Among other things he stated to them that he had never been a member of the Communist Party. He was then employed in the office of the Coordinator of Information and in the Office of Strategic Services as a civilian employee from March 1942 until November 1943 when he was drafted into the military service and as military personnel continued to work with the Office of Strategic Services. In September 1945 he was discharged from the Army and re-employed in the same organization. His Unit of OSS had during the latter period been transferred to the State Department. In May 1946 he learned that his resignation would be requested, apparently for security reasons. On learning this he asked for an interview with Mr. Panuch, the Deputy Assistant Secretary for Administration in the State Department. About June 1, 1946 in a long private interview with Mr. Panuch, Marzani again stated that he was not a member of the Communist Party *and never had been.* Apparently after further investi-

gation by the Department he was on December 20, 1946, notified that he had been discharged from the service.

In 1947 Marzani was indicted in 11 counts under section 80 of title 18 (which later in 1948 became in part section 1001). The first 9 counts alleged false statements made in 1942 to representatives of the FBI and the Civil Service Commission to the effect that he was not a member of the Communist Party. The remaining 2 counts alleged false statements on or about June 1, 1946 to Mr. Panuch. The District Judge overruled a motion to dismiss the indictment, D. C., 71 F.Supp. 615, and on the trial Marzani was convicted on all 11 counts. On appeal it was held in an extended opinion that the offenses alleged in the first 9 counts, based on statements made in 1942, were barred by limitations but the conviction on the last 2 counts was sustained. On a motion for re-hearing a supplemental opinion was filed to the effect that the conviction on the last 2 counts was valid even though Marzani's alleged false statements in 1946 to his superior officer in the State Department with respect to his proposed dismissal was sufficient under section 80, although they were not in writing, not under oath, and not stenographically reported. On petition for certiorari the judgment of the Court of Appeals was affirmed by an equally divided court. 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431, Dec. 20, 1948.

Here again the Marzani case does not present the particular situation in the instant case. What was upheld was the false statements made by Marzani in an interview which he requested for the purpose of affecting the proposed action of the State Department in requesting his resignation. He was an actor in that matter and volunteered the information. The subject matter of his retention or dismissal was clearly within the jurisdiction of the State Department of which he was an employee at the time. While the case, to the extent affirmed by the Court of Appeals, is quite different from, and a much stronger case for the Government than, the case with which we are here

concerned, it is perhaps not without significance to note that in the Supreme Court the affirmance was without opinion by an evenly divided court.

Since the amendment of the statute in 1934 there have been many reported cases dealing with the subject of false (either written or oral) statements in a matter "within the jurisdiction of any department or agency of the United States" and arising under section 1001 or its predecessor, section 80. I have examined many of them but find that none that have come to my attention involve a situation similar to the instant case. In general it may be said that the decided cases uphold and apply the statute where the statements are either written or oral and where the facts clearly bring the subject matter "within the jurisdiction" of the government department or agency. The phrase "within the jurisdiction" first appeared in the 1934 amendment although a similar phrase had been used in a similar amendment shortly theretofore enacted by Congress but vetoed by the President for reasons not material here. I think it will be sufficient to refer particularly to the opinion of two or three appellate decisions construing and applying the phrase.

It is well here to again refer to the opinion of Chief Justice Hughes in the Gilliland case, supra, where, on page 93 of 312 U.S., on page 522 of 61 S.Ct., it is noted that the effect of the amendment in 1934 which prohibited false statements and the use of false documents "in any matter within the jurisdiction of any department or agency of the United States" "indicated the congressional intent to protect the authorized functions of governmental departments and agencies *from the perversion which might result from the deceptive practices described.*" (Italics supplied.)

In Terry v. United States, 131 F.2d 40, 44, the Eighth Circuit dealt with the application of the statute to alleged false writings relating to the National Housing Act. In the opinion it was said that the proper interpretation of the phrase "within the jurisdiction" "must be made

in the light of the legislative intent as it has been disclosed in the Acts of Congress."

In Carroll Vocational Institute v. United States, 1954, 211 F.2d 539, 540, the Fifth Circuit defined the phrase in a case relating to the jurisdiction of the Veterans' Administration in these words: " 'Jurisdiction' means the right to say and the power to act; and, as between agencies of the government, jurisdiction is the power of that particular agency to administer and enforce the law", citing, among others, the Gilliland case.[1]

The United States Attorney refers to three unreported cases dealing with false statements made to Agents of the FBI which he thinks tend to support the government's position. I find them all distinguishable from the instant case. In United States v. Narelle, July 7, 1944, there is a memorandum opinion by District Judge Caffey in the Southern District of New York refusing to dismiss an indictment against the defendant for alleged false statements to Agents of the FBI and Inspectors of the War Department relating to the cost value of certain barges sold to the government, in consequence of which it was alleged the government had fraudulently been caused to pay an excessive price. The indictment charged that the matter was within the jurisdiction of the Department of Justice. Whether the case was ever tried does not appear. As the indictment alleged the jurisdiction of the Department the motion to dismiss was properly overruled. A similar ruling was made in the case of United States v. Moore, 185 F.2d 92, supra. And here, it may be pointed out, that a similar ruling was made in the refusal of this court to dismiss the indictment in this case. The question as to whether on the facts the matter was within the jurisdiction of the FBI or the Department of Justice ordinarily would not arise until the trial of the case and

would not have presently arisen here except for the stipulation of counsel.

In United States v. Eubanks, W.D. Wash. (1954) the defendant, a woman, was indicted for false statements made by her to an FBI Agent against a third person in relation to the Federal White Slave Traffic Act. During the trial the defendant pleaded guilty. It will be noted that the defendant in that case voluntarily took the initiative as an actor in giving the false information to the FBI.

In United States v. Bray, N.D.Ga. (1953) the defendant had made a false statement to FBI Agents charging a third person with acts allegedly violative of the defendant's civil rights. During the trial the defendant entered a plea of guilty and was sentenced. Here again the defendant's statement was in the rule of a complainant seeking action by the Department of Justice. From the references made by counsel to the last two cases it does not appear that there was judicial consideration given to the statutory evolution of section 1001, and, as the defendants pleaded guilty, there was probably no necessity for the final judge to do so.

Having reviewed the statutory evolution of section 1001 and the most pertinent judicial decisions in criminal cases based thereon, it is now necessary to appraise this legal data to determine the answers to questions submitted in the stipulation of counsel. I will consider the matter particularly in relation to two questions: (1) were the alleged *answers* given by the defendants in this case to FBI Agents "statements" within the meaning of section 1001; and (2) was the matter "within the jurisdiction" of the Federal Bureau of Investigation or the Department of Justice.

(1) Were they "statements". The question here is not merely whether they were "statements" within the broad dic-

---

1. Some additional cases dealing with the application of the phrase "within the jurisdiction" under varying circumstances are: United States v. Zavala, 2 Cir., 1944, 139 F.2d 830; United States v. Ganz, D.C.Mass.1942, 48 F.Supp. 323;

United States v. White, D.C.S.D.Cal. 1946, 69 F.Supp. 562; United States v. Meyer, 2 Cir., 1944, 140 F.2d 652; United States v. Goldsmith, 2 Cir., 1940, 108 F.2d 917; Cohen v. United States, 9 Cir., 1953, 201 F.2d 386.

tionary sense of the term; but rather were they statements within the intent of Congress in making the amendment of 1934 to what was then section 35 of the Penal Code. The Bramblett case in the Supreme Court in reviewing the statutory evolution states that amendments to section 35 of the Penal Code since 1934 have not made any important change in the scope of the 1934 Act, which, for convenience in the re-codification in 1948 of title 18, carried into section 1001 one part only of the 1934 Act.

For clarity in ascertaining the Congressional intent it will be helpful to read the whole of section 35 as amended in 1934 as it appears in 48 Stat. 996. Prior to the amendment it is clear enough that the kind of purpose of statements referred to had relation only to pecuniary claims upon or financial interests of the government. United States v. Cohn, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616. The purpose of the amendment, as pointed out in the Gilliland case [312 U.S. 86, 61 S.Ct. 522], was to sufficiently broaden the statute "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described". The first part of the 1934 statute clearly related only to false claims against the government; and then in the alternative, punishment was authorized for "whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, in any matter within the jurisdiction of any department or agency of the United States". The remaining lengthy phraseology of the Act deals with property matters of the United States and has no bearing on the statutory interpretation of what constitutes false statements in the part just quoted.

As to the mere form of the statement, the statute makes no requirement with respect to whether it is in writing or oral only, or whether given under oath or not. And the adjudicated cases under the statute have construed and applied the statute to include all such forms of false statements. United States v. Beacon Brass Co., 344 U.S. 43, at page 46, 73 S. Ct. 77, 97 L.Ed. 61; and other cases above cited.

However, the problem here is not to be determined by the mere physical form of the statement but rather by its intrinsic nature and purpose. Running through the whole Act there seems to be discussed the congressional purpose to (1) protect the government against false pecuniary claims and (2) as stated in the Gilliland case, to protect governmental agencies from perversion of their normal functioning. The purpose seems to be to protect the government from the affirmative or aggressive and voluntary actions of persons who take the initiative, or, in other words, to protect the government from being the victim of some positive statement, whether written or oral, which has the tendency and effect of perverting its normal proper activities. In the instant case the defendants did not volunteer information, they were not seeking any action by the government or making any claim upon it, or for action by its officers against other persons. In this respect the present case is quite distinguishable from any adjudicated case which has been called to my attention.

And it must be noted that in the alternative and broadening prohibition included in the 1934 amendment the word "statements" is closely associated with the word "representations" which connotes the kind of a statement that is intended to be acted on by the person to whom made. That is, the ordinary legal concept of representation at various fields of jurisprudence, and would seem to have similar meaning in this statute. 37 Words and Phrases, pp. 35, et seq. And we also find in the same closely worded phraseology that the statement must have been knowingly and willfully made or

concealed or accompanied by some trick, scheme, or device and must relate to a *material* fact. Again, in close verbal association are specified various types of false statements such as bills, receipts, vouchers, rolls, accounts, claims, certificates, affidavits or depositions. We note that in the Gilliland case the Supreme Court rejected the familiar rule of construction of *ejusdem generis* in construing the alternative provision in the amendment with respect to the requisite of financial interests of the United States, the opinion, 312 U.S. at page 93, 61 S.Ct. at page 522, saying:

> "The rule of *ejusdem generis* is a familiar and useful one in interpreting words by the association in which they are found, but it gives no warrant for narrowing alternative provisions which the legislature has adopted with the purpose of affording added safeguards. 'The rule of *"ejusdem generis"* is applied as an aid in ascertaining the intention of the Legislature, not to subvert it when ascertained'. [State of] Texas v. United States, 292 U.S. 522, 534, 54 S.Ct. 819, 825, 78 L.Ed. 1402."

■ The application of the rule of construction contended for in that case was to interpret the alternative and broadened provision of the Act by the limitation with respect to financial interests found in the former or other provisions of the Act before its amendment. Here, however, we are concerned directly with the construction of the alternative provision itself unaffected for the particular purpose with association with other provisions of the Act. The main objective of the construction is to ascertain the intention of Congress and it seems quite permissible to me as a rule of interpretation to apply the rule of *ejusdem generis* to the several closely associated words in the very alternative provision which we must here construe. I conclude, therefore, that the legislative intent in the use of the word "statement" does not fairly apply to the kind of statement involved in this case where the defendants did not volunteer any statement or representation for the purpose of making claim upon or inducing improper action by the government against others. Nor were they legally required to make the statement.

■ (2) The next question for determination is whether the alleged false answers given to FBI Agents were in a matter within the jurisdiction of the Agency.

As previously pointed out, by section 299 of title 5 U.S.C.A. the Attorney General is authorized to appoint officials "for investigations regarding official matters under the control of the Department of Justice and the Department of State". And by section 300 of title 5, as amended in 1950, the Attorney General is authorized to appoint officials "for the detection and prosecution of crimes against the United States", etc. These sections and various appropriation Acts of Congress seem to be the principal statutory recognition of and authority to the FBI as an Agency of the Department of Justice, existing at the time of the defendants' statements or answers given in this case. See also the later Act of Congress of August 31, 1954, c. 1143, § 1, 68 Stat. 998, which specifically authorizes the Federal Bureau of Investigation "to investigate any violation of Title 18, involving Government officers and employees." 5 U.S.C.A. § 311a. See also title 5, § 93, which authorizes officers or clerks of any department lawfully detailed to investigate fraud to administer oaths to any witness attending to testify or depose in the course of such investigation. Whether this latter statute authorized the FBI Agents to administer oaths to the defendants is disputed by the parties here and it is not necessary to decide for the purposes of this case.

Heretofore I have decided that the FBI did have power and authority to investigate the subject of the confidential communications to it relating to alleged bribery or attempts to bribe an Inspector of the Federal Housing Administration. However, there is a clear distinction between the power to investigate and the jurisdiction or authority to de-

cide and act upon a particular subject matter. See United States v. White, D.C., 69 F.Supp. 562, 564 and Carroll Vocational Institute v. United States, 5 Cir., 211 F.2d 539, supra. For instance, a United States Commissioner has the power to investigate by giving a preliminary hearing to a defendant accused of crime; but except for petty offenses, has no jurisdiction to adjudicate other than dismissing the complaint or holding the defendant for further action. The jurisdiction of a court is, of course, a well-known term with respect to the authority of the court to hear, try and determine a case. In like manner the important functions of the Department of Justice with respect to criminal offenses against the United States is the power to investigate and initiate prosecutions, but not the power to decide whether a criminal offense has been committed. In this respect its functions are quite different from those of the Secretary of the Treasury with respect to the payment of claims against the United States, or the authority of many other agencies with respect to various governmental matters. I therefore conclude that in the particular situation here presented, the matter was not within the jurisdiction of the FBI or the Department of Justice within the meaning of that phrase as contained in section 1001.

In addition, there is an even more fundamental principle here involved. In substance the subject matter was simply this. The FBI suspected that the defendants had attempted to bribe a minor government official. They thereupon asked the defendants what they knew about it and in reply received denials of any knowledge upon the subject. Apparently as a result of their information or investigation the United States Attorney submitted the charge to a Grand Jury and obtained an indictment against the defendants jointly and separately, and in the same indictment against other defendants, for (1) bribery and (2) perjury. These are long well-known serious criminal offenses made punishable by federal statute. Title 18 U.S.C.A. § 201; Title 18 § 1621. On the defendants' mo-

tion the court dismissed the indictment for error in criminal pleading, and particularly for misjoinder of persons. Thereafter, instead of submitting to the Grand Jury new properly amended indictments for bribery or perjury or both, the government obtained new indictments based on section 1001. The 5th Amendment provides that no person shall be compelled to be a witness against himself in criminal cases. While not strictly applicable here the construction of section 1001 here sought by the government seems inconsistent with this great bulwark of individual liberty. I cannot think that such an application of the section could have been within the intent of Congress. Nor is such an application needed for the protection of government agencies from perversion of their proper functioning. The alleged false information given by the defendants to questions as to whether they had attempted to bribe or knew facts regarding bribery of a government official were not statements for the purpose of inducing action by the government and apparently could not have been the basis for the action actually taken in obtaining indictments for bribery and perjury; nor did the statements defeat the obtaining of such indictments. It seems quite inconsistent with our fundamental concepts of due process in the administration of criminal justice to abandon charges of bribery and perjury against the defendants, and then to indict them for previously denying their complicity therein, as a different separate substantive criminal offense under section 1001. The clear purpose of the section was to operate as a shield for defense rather than as a sword for attack.

The sweeping generality of the language of section 1001, especially when isolated as it appears in the 1948 revision from the remainder of the 1934 amendment, requires caution in applying it to particular situations. In my opinion it is not properly applicable here.

It is not meant to decide that statements made to the FBI in other situations than here presented are necessarily not within the prohibition of section

1001. The points decided herein relate only to the particular case presented. The FBI does have the authority to make investigations into criminal matters particularly, and also may be duly authorized from time to time to investigate as to other subjects, as, for instance, when they make investigations for reports to departments or agencies which have the authority to act upon them for the government. I think it is commonly known that Agents of the FBI do customarily, or at least frequently, make investigations with regard to the suitability of prospective appointees to governmental offices. But that it not the situation here presented.

Having decided the principal issues of law arising in this particular case, I now proceed to answer categorically, as far as possible, the various questions submitted by the stipulation of counsel, above referred to:

(a) The Federal Bureau of Investigation may be a department or agency within the meaning of title 18 U.S.C. § 1001; but in the instant case, in my opinion, they were not acting in a matter within their jurisdiction within the meaning of section 1001.

(b) The Department of Justice may be, in proper cases, a "department or agency" within the meaning of title 18 § 1001; but in my opinion the FBI, acting for the Department of Justice, was not acting within its jurisdiction within the meaning of section 1001 under the particular facts of this case.

(c) The investigation made by the FBI in this case was a "matter" within the meaning of that term in title 18 U.S.C. § 1001 for investigation by the FBI; but the answers allegedly given by the defendants were not "statements" within the meaning of the section.

(d) While there was a matter proper for investigation by the FBI the alleged answers of the defendants were not statements as that term is used in section 1001, and as to such answers, the matter was not within the jurisdiction of the FBI.

(e) The question is "were the alleged statements of the defendants material to the matter". It is not possible merely on the evidence heretofore submitted to give a categorical answer to this question. The materiality of a matter may be on the whole evidence in any case either a question of fact or one of law, or a mixed question of fact and law. If there had been a trial on the original indictment for perjury and there was no evidence other than that heretofore submitted, in my opinion the answers would have been material; but on the charge based on section 1001 as so far presented I think the answers were not material because for the reasons heretofore given the subject matter was not within the jurisdiction of the FBI Agents. It seems also unnecessary to answer question (e) in view of the conclusion heretofore reached.

(f) The alleged answers made by the defendants are not statements within the jurisdiction of the FBI within the meaning of section 1001.

(g) The Special Agents of the FBI to whom each defendant is alleged to have made false statements were lawfully detailed to make the investigation referred to in the indictment, but the subject matter was not within their jurisdiction within the meaning of section 1001.