## COHEN v. UNITED STATES.

No. 13202.

United States Court of Appeals Ninth Circuit.

Jan. 6, 1953.

Rehearing Denied Feb. 5, 1953.

See also 191 F.2d 300.

---

388

Morris Lavine, Los Angeles, Cal., for appellant.

Walter S. Binns, U. S. Atty., Ray H. Kinnison, George M. Treister, Asst. U. S. Attys., and Ernest R. Mortenson, District Counsel, U. S. Treasury Department, Los Angeles, Cal., for appellee.

Before HEALY, BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

Appellant Cohen stands convicted on three of five counts of an indictment charging income tax evasion and one count based upon a false financial statement given to Treasury Department agents. Two counts were dismissed.

 Cohen was sentenced to imprisonment of five years on each count and a $10,000 fine, the sentences to run concurrently and the payment of $10,000 to satisfy the fines in full. Hence, the total of the sentences imposed did not exceed the maximum provided by law for each count.

Counts One, Three and Five of the indictment charged appellant with wilful and knowing evasion of his income taxes for the years 1946, 1947 and 1948 within the meaning of 26 U.S.C.A. § 145(b).[1] The Government's proof was based upon the so-called "expenditure method." This method involves determination of the taxpayer's net worth at the beginning of a period and computation of the taxpayer's expenditures during the period. If such expenditures exceed reported income for the period and net worth has remained constant or changes

1. "§ 145. Penalties * * *.

"(b) Failure to collect and pay over tax, or attempt to defeat or evade tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

otherwise accounted for, the conclusion may be drawn that total income was not properly reported. In the instant case the Government claims to have established that the appellant's net worth did not exceed $3,110.82 on January 1, 1946, and relies on oral statements made by appellant to police officers on November 17, 1945, and also a written document labeled "Net Worth Statement," which appellant gave to Treasury agents on January 3, 1950. The Government called to the stand more than one hundred witnesses, the sum total of whose testimony was to the effect that during the three years in question appellant expended not less than $345,933.53 while reporting as income only $72,777.52. Much evidence was also introduced to disprove appellant's contention that he had borrowed $172,500.00 during the three-year period.

Count Six charged appellant with knowingly and wilfully making false statements to Treasury agents within the meaning of 18 U.S.C.A. § 1001.[2] Treasury agents engaged in an investigation of appellant's income tax liability had asked appellant's tax adviser for a statement relating to his financial affairs. During a conference with appellant and his tax adviser lasting nearly an hour, appellant signed a document designated "Net Worth Statement," previously prepared by his tax adviser, which purported to show that during the three years in question appellant had borrowed from various named individuals the total sum of $172,500 and during the same period expended $244,163.15. There was considerable discussion at that time concerning the various items listed. The Government's evidence tended to show that appellant had borrowed no more than $23,000 during the

period and expended a total sum of $345,933.53.

Since identical concurrent sentences of five years and $10,000 fine were imposed upon appellant, and, as a result thereof, this sentence did not exceed the maximum sentence which could have been imposed under each count on which he was convicted, the judgment will not be reversed if any one count is free from error. Ex parte Cohen, 9 Cir., 1951, 191 F.2d 300; Brandon v. United States, 9 Cir., 1951, 190 F.2d 175; Lowden v. United States, 9 Cir., 1951, 187 F.2d 484; Danziger v. United States, 9 Cir., 1947, 161 F.2d 299, certiorari denied 332 U.S. 769, 68 S.Ct. 81, 92 L.Ed. 354.[3] Where one count is free from error in such a situation, possible error in other counts is not prejudicial.

Appellant raises a number of questions as to the validity of his conviction on the counts pertaining to wilful and knowing evasion of income taxes. We need not examine these contentions because we find, after careful consideration of appellant's arguments, that conviction on Count Six, the false statements count, was free from error. We also note the general assignments of error made by appellant which affect the entire trial.

I. Effect of the Kefauver Hearings.

The Special Committee to Investigate Organized Crime in Interstate Commerce,[4] commonly known as the Kefauver Committee, held hearings in Los Angeles during the month of November, 1950. Appellant appeared under subpoena as a witness during these hearings and testified concerning the source and extent of his financial resources. He now contends that 2 U.S.C.A.

**2.** "§ 1001. Statements or entries generally
"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not

more than five years, or both. June 25, 1948, c. 645, 62 Stat. 749."

**3.** Other circuits have followed the same rule. Jarvis v. United States, 1 Cir., 1937, 90 F.2d 243, certiorari denied 302 U.S. 705, 58 S.Ct. 25, 82 L.Ed. 544; Cravens v. United States, 8 Cir., 1932, 62 F.2d 261, certiorari denied 289 U.S. 733, 53 S.Ct. 594, 77 L.Ed. 1481.

**4.** The Committee was established pursuant to Sen.Res.No.202, 81st Cong., 2d Sess. (1950).

§ 192 [5] created a statutory compulsion to testify and that immunity from prosecution in the federal courts followed automatically therefrom. The cases relied upon by appellant in support of this proposition, for example, United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376; Smith v. United States, 1949, 337 U.S. 137, 69 S. Ct. 1000, 93 L.Ed. 1264, are not in point since they deal with testimony compelled by a so-called "compulsory testimony" statute designed as a complete substitute for the privilege against self-incrimination, U.S. Const. Amend. V. These "compulsory testimony" statutes [6] have been enacted where Congress has been willing, in exchange for full testimony, to give immunity from prosecution in connection with the matters which were the subject of the testimony. No such statutory immunity has been granted in relation to testimony before the Kefauver Committee.

■ Since no "compulsory testimony" statute was applicable, appellant was fully protected by the privilege of the Fifth Amendment. In Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, the Supreme Court held that where a statute merely prohibited the use of evidence obtained from a party by means of a judicial proceeding against that party in a federal criminal prosecution, rather than granting immunity from suit, it was not a "full substitute" for the constitutional privilege, which was therefore still available. The instant situation is comparable because the only statutory protection given appellant was a prohibition of his evidence subsequently being used against him. 18 U.S.C.A. § 3486.

Although the privilege against self-incrimination was always available to him,[7] appellant did not see fit at any time during

5. "§ 192. Refusal of witness to testify.

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months. As amended June 22, 1938, c. 594, 52 Stat. 942."

6. Counsel cited the following as examples: Interstate Commerce Act of 1893, 49 U.S.C.A. § 46, Act of Feb. 11, 1893, c. 83, 27 Stat. 443; 15 U.S.C.A. § 32, Act of Feb. 25, 1903, c. 755, § 1, 32 Stat. 904; Securities Exchange Act, 15 U.S. C.A. § 78u(d), Act of June 6, 1934, c. 404, § 21, 48 Stat. 899, as amended; Investment Advisers Act of 1940, 15 U.S.C. A. § 80b–9(d), Act of Aug. 22, 1940, c. 686, Title II, § 209, 54 Stat. 853; Federal Trade Commission Act, 15 U.S.C.A. § 49, Act of Sept. 26, 1914, c. 311, § 9, 38 Stat. 722; China Trade Act, 1922, 15 U.S.C.A. § 155(c), Act of Sept. 19, 1922, c. 346, § 15, 42 Stat. 853; National Prohibition Act of 1919, 27 U.S.C.A. § 47

(now repealed), Act of Oct. 28, 1919, c. 85, 41 Stat. 317; Reports under White Slave Act, 18 U.S.C.A. § 2424(b) (formerly 18 U.S.C.A. § 402), Act of June 25, 1948, c. 645, 62 Stat. 813; Industrial Alcohol Act, 26 U.S.C.A. § 3119 (by virtue of 53 Stat. 363), Act of Aug. 27, 1935, c. 740, § 11, 49 Stat. 875 (formerly 27 U.S.C.A. § 160); Public Utility Holding Company Act, 1935, 15 U.S.C.A. § 79r(e), Act of Aug. 26, 1935, c. 687, Title I, § 18, 49 Stat. 831, as amended; National Labor Relations Act, 29 U.S. C.A. § 161(3), Act of July 5, 1935, c. 372, § 11, 49 Stat. 455, as amended; Communications Act of 1934, 47 U.S.C.A. § 409 (i), Act of June 19, 1934, c. 652, § 409, 48 Stat. 1096; Civil Aeronautics Act of 1938, 49 U.S.C.A. § 644(i), Act of June 23, 1938, c. 601, § 1004, 52 Stat. 1021, as amended; Emergency Price Control Act, § 202(g), 50 U.S.C.A.Appendix, § 922(g), which adopts by reference the immunity provisions of the Compulsory Testimony Act of Feb. 11, 1893, 49 U.S.C.A. § 46; Federal Power Act, § 307(g), 16 U.S.C.A. § 825f(g), 49 Stat. 856; Fair Labor Standards Act of 1938, § 9, 29 U.S.C.A. § 209, 52 Stat. 1065; The Railroad Unemployment Insurance Act, § 12(c), 45 U.S.C.A. § 362(c), 52 Stat. 1107.

7. Senator Estes Kefauver, Chairman of the Committee, informed appellant of his constitutional rights at the commencement of his testimony.

the hearing to claim this privilege. Therefore, since appellant was never compelled to testify after claim of his constitutional privilege, no question of automatic immunity arises.[8] See Counselman v. Hitchcock, supra.

■ The further question raised concerning the Kefauver hearings involves the effect of 18 U.S.C.A. § 3486, which provides: "No testimony given by a witness * * * shall be used as evidence in any criminal proceeding against him * * *." Appellant asserts that introduction into evidence of Exhibit 20, the so-called net worth statement, violated § 3486 because a copy of this document was obtained by subpoena from appellant's accountant and tax adviser by the Kefauver Committee and appellant was questioned concerning the document on November 17, 1950, by the Committee. This argument ignores the fact that agents of the Treasury Department, in the course of their independent investigation of appellant's financial affairs, had already obtained a copy of this document on January 3, 1950. Thus it cannot be said that evidence obtained by the Committee was relied upon in any way for the subsequent criminal prosecution. D. E. Goodykoontz, Treasury Department agent, made an affidavit averring that all the information used as a basis for the criminal indictment was obtained prior to November 15, 1950. Ernest A. Tolin, then United States Attorney, made an affidavit averring that no portion of the testimony or information derived from the Kefauver Committee hearings was to be used in the prosecution of the case.

There was no violation of the statutory prohibition.

II. Constitutional Application of § 1001.

■ The constitutionality of former § 80 of Title 18 U.S.C.A., now § 1001,[9] has been upheld against a claim of indefiniteness. United States v. Gilliland, 1941, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598. Appellant contends, however, that in order to preserve the constitutionality of the statute the courts have interpreted § 1001 and its earlier counterparts to apply only to statements alleged to be false which were required to be made by some law or regulation. We do not agree. Although the particular false statements in issue in United States v. Gilliland, supra, were contained in reports and affidavits which were required to be made, the Supreme Court did not indicate that this was an essential condition to the applicability of 18 U.S.C.A. § 80, now § 1001.

A similar question was raised on petition for rehearing in Marzani v. United States, 1948, 83 U.S.App.D.C. 78, 168 F.2d 133, affirmed 335 U.S. 895, 69 S.Ct. 299, 93 L. Ed. 431, where a State Department employee voluntarily sought an interview with his superior officer to discuss a request which had been made for his resignation. The Court held that the employee was subject to prosecution for false oral statements made in that interview despite the fact that the employee was not required to attend such an interview or make the statements. It will not suffice to distinguish the cases, as appellant urges, by noting that in the Marzani case the government employee dis-

---

"Mr. Cohen, you are well represented by your attorneys, Mr. Strong and Mr. Schwartz, but as chairman of this committee, with also Senators Tobey and Wiley being present, I think we should advise you of your constitutional rights. I am sure that your attorneys have.

"That is, that you may object to answering any question, which the chairman of the committee will rule upon, which you feel would tend to incriminate you of any Federal offense * * *." Hearings Before the Special Committee to Investigate Organized Crime in Interstate Commerce, 81st Cong., 2d Sess., and

82d Cong., 1st Sess., Part 10, Nevada-California, at 194 (1950).

8. Congress has at times seen fit specifically to grant immunity even where there has been no claim of the privilege against self-incrimination. For example, 15 U. S.C.A. § 32; Federal Trade Commission Act, 15 U.S.C.A. § 49.

9. § 1001 is based on 18 U.S.C.A., 1940 ed., § 80, March 4, 1909, c. 321, § 35, 35 Stat. 1095 [derived from Rev.Stat. § 5438; May 30, 1908, c. 235, 35 Stat. 555]; October 23, 1918, c. 194, 40 Stat. 1015; June 18, 1934, c. 587, 48 Stat. 996; April 4, 1938, c. 69, 52 Stat. 197.

cussed "officially" with his superior an "official" request for his resignation. The point is that the statements, as here, were voluntarily made.

■ Appellant asserts that § 1001 cannot be constitutionally applied in the instant situation because he had no suitable notice of the consequences if the statements made in the net worth statement were false or fraudulent, and knowingly and wilfully made. But appellant must have known the significance of the conference of January 3, 1950. This was no social conversation. The Treasury Department had been investigating appellant's income tax liability. Treasury agents had requested a statement relating to his financial affairs. The document in question was signed only after a discussion of nearly an hour as to various items therein. Appellant was specifically asked whether he understood how important it was that his statements in the document be truthful. It was apparent that investigation of a failure to pay income taxes was a "matter within the jurisdiction of any department or agency of the United States" within the meaning of § 1001. The consequences of knowingly and wilfully making the false statements were therefore clear.

### III. Relationship of § 1001 to the Internal Revenue Code.

The contention is made that § 1001 was not intended to apply to internal revenue matters at all, that the Internal Revenue Code, Title 26 U.S.C.A., was meant to be exclusive and provide the sole means of punishing those who violate the provisions of the Code. Appellant, however, was not convicted under Count Six of a violation

of the Internal Revenue Code; he was instead convicted of violating a statute based upon the broad public policy against the making of false statements in *any* matters within the jurisdiction of *any* department or agency of the United States.

We believe the discussion of the Supreme Court in United States v. Gilliland, supra, concerning the statute in question is particularly pertinent: "The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described. We see no reason why this apparent intention should be frustrated by construction." 312 U.S. at page 93, 61 S. Ct. at page 522.

In the very recent case of United States v. Beacon Brass Co., 1952, 344 U.S. 43, 73 S.Ct. 77, the Supreme Court clearly indicates that § 1001 may apply to certain false and fraudulent statements made to Treasury Department representatives.

Appellant asserts that even if § 1001 was at one time applicable to false statements made to Treasury agents § 1001 was repealed by implication, in so far as it ever applied to internal revenue matters, by the enactment on August 27, 1949, of 26 U.S. C.A. § 3809,[10] a statute dealing specifically with verified statements made to the Treasury Department which are false.

■ In United States v. Gilliland, supra, where a similar argument was made that the Hot Oil Act of 1935 repealed by implication the application of § 80, the predecessor of § 1001, Title 18 U.S.C.A., to that specific field, the Court held that the broad false statement provisions of § 80

---

10. "§ 3809. Verification of returns; penalties of perjury
"(a) Penalties. Any person who willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter, shall be guilty of a felony, and, upon conviction thereof, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

* * * * * * *

"(c) Verification in lieu of oath. The Commissioner, under regulations prescribed by him with the aproval of the Secretary, may require that any return, statement, or other document required to be filed under any provision of the internal revenue laws shall contain or be verified by a written declaration that it is made under the penalties of perjury, and such declaration shall be in lieu of any oath otherwise required. Added Aug. 27, 1949, c. 517, § 4(a), 63 Stat. 667."

have their place as a "fitting complement" to other statutes dealing with false statements in particular fields. See also United States v. Beacon Brass Co., supra; Ex parte Berkoff, D.C.Minn., 1946, 65 F.Supp. 976, affirmed on other grounds, 8 Cir., 1947, 159 F.2d 5. A number of other cases illustrate that specific legislation will not be held to have repealed by implication more general legislation in this field where another reasonable construction can be applied. See, for example, United States v. Noveck, 1927, 273 U.S. 202, 47 S.Ct. 341, 71 L.Ed. 610. Repeals by implication are not favored. See United States v. Borden Co., 1939, 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181; United States v. Jackson, 1938, 302 U.S. 628, 631, 58 S.Ct. 390, 82 L.Ed. 488; Bryan v. Fumio Arai, 9 Cir., 1933, 64 F.2d 954, 956.

We find nothing in the language or legislative history of 26 U.S.C.A. § 3809 which convinces us that Congress intended by enactment of this statute to decrease the scope of 18 U.S.C.A. § 1001. "If Congress had intended to repeal the law here challenged, it would have been a simple matter to give expression to such intent." Ex parte Berkoff, supra, 65 F.Supp. at page 980. Enactment of 26 U.S.C.A. § 3809 was accompanied by express repeal of certain other laws.[11] Yet there was no mention of § 1001 of Title 18 U.S.C.A. We think the congressional intent in enacting § 3809 was merely to simplify the task of both taxpayer and the Bureau of Internal Reve-

nue by permitting a verified return to be substituted for a notarized return in certain situations.[12] Section 3809(a) was apparently intended to take the place of 26 U.S.C.A. § 145(c),[13] which was repealed. The statutes in question describe different offenses. 18 U.S.C.A. § 1001 prohibits knowing and wilful oral or written false statements made in a matter within the jurisdiction of any department or agency. 26 U.S.C.A. § 3809 is concerned with the verification of a written return, statement or other document which is not believed to be true and correct as to every material matter.

IV. Sufficiency of the Evidence.

The Government had the burden of establishing only that the net worth statement given by appellant to the Treasury agents on January 3, 1950, was false in one material respect. By the testimony of more than one hundred witnesses and much documentary evidence the Government met that burden with evidence that appellant's expenditures during the 1946–1948 period exceeded by more than $100,000 the disbursements listed on the net worth statement and that many of the alleged loans listed on the statement in fact had not been made. The testimony of Arthur Seltzer alone was sufficient evidence upon which to find that appellant knowingly and wilfully made a false statement, in that the net worth statement indicated that $25,000 had been borrowed from Arthur Seltzer.[14]

11. 26 U.S.C.A. §§ 51(d), 145(c) and 1630. Act of August 27, 1949, c. 517, § 4(b), 63 Stat. 668.

12. The pertinent committee report states as follows:
"Section 4. Verification of Returns.
"This section gives the Commissioner authority to eliminate the oath in the case of corporate, fiduciary, partnership, estate, and gift-tax returns, and other returns or statements. The present law eliminates the oath in the case of individual income-tax returns and employment-tax returns. These changes will not only relieve the taxpayers of the burden of notarizing their returns but will expedite the processing by the Bureau of returns which might otherwise have to be sent back for compliance with the oath requirement." Sen.Rep.No.685,

81st Cong., 1st Sess., Part II, § 4 (1949).

13. "§ 145. Penalties
* * * * * * *
"(c) Any individual who willfully makes and subscribes a return which he does not believe to be true and correct as to every material matter, shall be guilty of a felony, and, upon conviction thereof, shall be subject to the penalties prescribed for perjury in section 125 of the Criminal Code."

14. Arthur Seltzer's testimony concerning the alleged loan was as follows:
"Q. By Mr. Tolin: Now what conversation was had—what was the conversation that you had at that time with Mr. Cohen about money? A. He asked me if I could enter in my records the

■ The question of whether the so-called net worth statement was properly labeled is not relevant to Count Six, since prosecution under § 1001 does not depend upon classification of the statement as one pertaining to "net worth" rather than merely "cash on hand," but instead upon whether or not a false statement was made. Investigation of income tax matters, as we have noted, is a matter within the jurisdiction of the Treasury Department.

Appellant argues that the corpus delicti was established solely by statements in an "extra-judicial admission," i.e., the net worth statement. It should be apparent that prosecution for making a false statement must be based upon the allegedly false statement itself. The crime was established by a wealth of independent evidence, as we have indicated. Spriggs v. United States, 9 Cir., 1952, 198 F.2d 782, is not in point, since there the criminal prosecution was based *solely* on statements made by the defendant and there was a complete lack of independent proof that a crime had been committed.

### V. Entrapment.

■ Appellant contends that solicitation and use of the net worth statement was for the purpose of prosecution, and conviction based thereon is contrary to public policy.

It is quite obvious that the criminal intent in the present case originated with the appellant, not with the Government. The Treasury agents did not ask appellant to do something which in itself was a violation of law. He was not asked to submit a net worth statement containing false statements. The request by the agents for a financial statement can hardly be characterized as enticement to commit a crime.

The distinction is clearly drawn in the case upon which appellant relies. Chief Justice Hughes states in Sorrells v. United States, 287 U.S. 435 (1932) at pages 441–442, 53 S.Ct. 210, at page 212, 77 L.Ed. 413: "It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. * * * A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute."

### VI. Fair Trial.

■ Strenuous objection is made to certain television broadcasts taking place during the time of the trial, at which it is alleged prosecution evidence and exhibits were displayed by the United States Attorney. It is asserted that these broadcasts deprived appellant of the fair trial guaranteed by the Fifth Amendment.

No objection appears to have been made before the trial court to the alleged television broadcasts. It is not contended that these television broadcasts were seen by any member of the jury, and in the absence of such a showing an impact upon the minds of the jurors prejudicial to appellant will not be presumed.

Judgment affirmed.

---

fact that I had loaned him $25,000 and when he asked me that I thought nothing of it and I said, 'Yes,' and that was the end of it.

"I returned back East to New York and thought nothing about it.

"Q. Well, had you loaned him $25,-000? A. I had not.

"Q. Had you loaned him any money at all? A. I hadn't loaned him any money at all.

"Q. Did he owe you any money at that time? A. He didn't owe me any money at all."