Eldred J. PATERNOSTRO, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18810.

United States Court of Appeals
Fifth Circuit.

Nov. 7, 1962.

Rehearing Denied Dec. 27, 1962.

Virgil M. Wheeler, Jr., Edward J. Boyle, Clem H. Sehrt, New Orleans, La., for appellant.

Prim B. Smith, Asst. U. S. Atty., M. Hepburn Many, U. S. Atty., New Orleans, La., for appellee.

Before TUTTLE, Chief Judge, and POPE * and GEWIN, Circuit Judges.

* From the Ninth Circuit sitting by designation.

GEWIN, Circuit Judge.

This is an appeal from a conviction and sentence under an indictment containing two counts; the first of which charges the appellant with knowingly and willfully making a false statement to a special agent of the United States Internal Revenue Service in violation of Title 18 U.S.C.A. § 1001.[1] The second count charges that the defendant committed perjury before a United States Grand Jury in violation of Title 18 U. S.C.A. § 1621.[2]

Count one of the indictment alleges in substance that the appellant stated:

1. That it was not within his own personal knowledge that "graft money" was collected and distributed in the Third District of the New Orleans Police Department; and

2. That he did not solicit and receive any money from an operator of an illegal business in the Sixth District of the New Orleans Police Department;
whereas, in truth and fact, said statements were false, and material to an investigation then being conducted by the Internal Revenue Service with respect to alleged unreported receipt of graft money distributed among members of the New Orleans Police Force.

Count Two, the perjury count, charges in substance that the appellant testified:

1. That he had never received any moneys in addition to his salary as a policeman other than revenue from a small restaurant;

2. That he had no personal knowledge of a system of organized graft while he was assigned to the Third District of the New Orleans Police Department; and,

3. That he had never solicited any moneys from operators of an illegal business in the Sixth District of the New Orleans Police Department;
whereas, such testimony was false and material to the matter then being investigated or considered by the Grand Jury. Responsive to a motion for a Bill of Particulars, the Government confined its evidence in chief to the Third and Sixth Districts, reserving the right to use other evidence available in rebuttal.

Appellant filed his motion to dismiss Count One of the indictment for the reason that Title 18 U.S.C.A. § 1001 has no application to the factual situation herein presented. During the investigation mentioned, a special agent of the Intelligence Division of the Internal Revenue Service administered an oath to the appellant and propounded certain questions to him concerning the alleged illicit income which was the subject of the investigation. The answers of the appellant were essentially "No" or negative and these answers were later deemed to be false.[3] This case squarely places before this Court the question of

1. "§ 1001. Statements or entries generally
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious · or fraudulent statements or representations, or makes or use any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 749."

2. "§ 1621. Perjury generally
 Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United

 States authorizes an oath to be administered, that he will testify, declare depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 773."

3. The following excerpts will show the nature of the questions and answers:
 "Q. 21. Lieutenant, did you receive from any individual in the Third District any money for any reason other than for business details or salary?
 "A. 21. No.

whether mere negative answers to certain questions propounded by Federal agents constitute "statements" within the meaning of that word as it appears in § 1001.

An excellent review of the statute under consideration is set forth in United States v. Bramblett, 348 U.S. 503, 75 S. Ct. 504, 99 L.Ed. 594 (1955); United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941); and United States v. Stark (D.C.Md., 1955) 131 F. Supp. 190. This section had its origin in a statute adopted about one hundred years ago in the "wake of a spate of frauds upon the Government". In its original form the statute clearly related to the presentation of false claims against any component of the Government to any officer of the Government. In 1934, the statute was revised largely at the request of the Secretary of Interior to cover "hot oil" shipments in the State of Texas. The Gilliland case held that the 1934 amendment, which eliminated the words "cheating and

"Q. 22. Specifically, I refer to graft money?

"A. 22. The answer is no.

"Q. 23. Did you know that graft moneys were being collected in the Third District?

"A. 23. As I told you earlier in our conversation, there were constant rumors in the Police Department about that and always there was a lot of joking and jesting about it.

"Q. 24. Did you know of your own knowledge that money was collected and distributed in the Third District?

"A. 24. Knowledge or suspicion?

"Q. 25. Knowledge?

"A. 25. Knowledge, no.

"Q. 26. Did you ever receive any money from Pat Fritcher or Sergeant Bray?

"A. 26. No.

"Q. 27. Did you ever know that collections of money were being made by certain members of the Third District from operators of illegal businesses when you were in the Third District?

"A. 27. Not to my personal knowledge, no.

"Q. 28. You have been in the First District for approximately two and one-half years. Since that time have you ever received any moneys from any individual for other than your salary or special details?

"A. 28. No.

"Q. 29. To your own knowledge, do you know whether or not there have been any collections and distributions of money to police officers in the First District since you have been there?

"A. 29. No.

"Q. 30. You have, no doubt, heard of the so-called bagman operator known as the pickup man. Have you ever received from any bagman or pickup man, or any other nomenclature that you wish to assign this individual, any moneys for other than your police salary or special detail?

"A. 30. No.

"Q. 31. Have you ever observed in the First District any man passing out or handing to any other men any money or any envelopes or any packages in your presence?

"A. 31. On numerous occasions, especially pay day, one or two men will be designated to go to a location and cash the checks, and brown envelopes are used to bring the money back to the individuals. Naturally, the individual's name and amount of the check are placed on the brown envelopes. That happened about two or three days ago.

* * * * *

"Q. 44. Specifically, have you ever discussed with Sergeant Bray the direct collection and distribution of any moneys that may have been collected by him or some other police officer?

"A. 44. At the time I was working in the Third District?

"Q. 45. Yes.

"A. 45. Then you are asking me to remember something that was discussed about four years ago. We probably did discuss it because it was the constant topic of conversation among the men.

"Q. 46. Did you during the time that you were in the Third District have any direct knowledge, through conversation with the person who may have collected and/or distributed weekly or biweekly money, of such money collected as graft money?

"A. 46. It goes to the same answer, Mr. Perry, you are asking me to say the same thing in a different phraseology. It is the same thing, constant source of discussion.

"Q. 47. Is there any basis for this discussion, of your own knowledge?

"A. 47. No, I cannot testify to it, to know that it is accurate.

swindling", broadened the statute to its present form (with minor changes) and eliminated the restriction of its application to cases involving pecuniary or property loss to the Government. Thus the statute was broadened to include "any matter within the jurisdiction of any department or agency of the United States" and clearly showed "the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described."

It seems clear that the alleged false statements in Gilliland and the alleged false statements under consideration in the instant case would not have been within the terms of the statute prior to the 1934 amendment. Bramblett holds that the statute has undergone no material change since the 1934 amendment.[4] Appellant urges that the background and history of the section clearly demonstrate that its purpose was to protect the Government from the affirmative, aggressive and voluntary actions of persons who take the initiative; and to protect the Government from being the victim of some positive statement which has the tendency and effect of perverting normal and proper governmental activities and functions.

The position of the appellant is not novel or new. The question has been considered by a number of Circuit and District Courts. One of the most searching and thorough opinions is that of Judge Chesnut in the Stark case, supra, 131 F.Supp. 190. After developing the historical background in an unusually thorough manner, Stark concludes that negative answers, even under oath, by contractors to questions propounded by agents of the F.B.I. who were investigating an alleged bribery attempt, as to whether the contractors knew of money

being given to officials of the Federal Housing Authority, were not "statements" within the meaning of the section. As to the negative answers there involved, the court concluded:

"* * * it is to be noted (1) that it was not in writing; (2) it purported to have been given under oath; (3) it did not relate to any claim by or on behalf of the defendants against the United States or any department or agency thereof; (4) it was not made by the defendants to obtain or retain any official position or employment in any agency or department of the government and (5) possibly more importantly, *was not initiated or volunteered by the defendants but was only an answer given in response to a particular inquiry.*" (emphasis added)

Following the statutory construction doctrine of "ejusdem generis" the court considered the relationship of the word "statement" with the word "representation" which immediately follows it and concluded that a representation is more akin to a voluntary statement than a mere passive answer.

Although published later than the Stark case (decided 1955, published 1955), United States v. Levin (D.C.Col. 1953, published 1956) 133 F.Supp. 88, passed upon the precise question here presented in a well reasoned opinion by Judge Pickett of the Circuit Court of Appeals, 10th Circuit, sitting as a District Judge. In Levin, the defendant was charged with stating to an F.B.I. agent that he had never told anyone that he had information as to the identity of a ladies dinner ring; when, in fact, he had told a person that he did have such information. It was held that the answer was not "a statement" within the meaning of § 1001. If held otherwise, any inquiry into cases of a minor-

---

"Q. 48. Did you, yourself, solicit and receive any money from an operator of an illegal business?

"A. 48. No."

4. The words "in any matter within the jurisdiction of any department or agen-

cy of the United States or of any corporation in which the United States of America is a stockholder", were added to take away the requirement of a pecuniary claim against the Government.

nature, even civil cases, if the citizen interrogated wilfully falsified his statements, would constitute a violation, and such person would be subject to a prison term of five years and a fine of $10,000, either or both. The statute does not require an oath, and the penalty provided exceeds the penalty for perjury. Such a construction, the opinion holds, would weaken the force and purpose of the perjury statute and it was there thought that Congress could not have intended such results.

"If the statute is to be construed as contended for here by the United States, the results would be far-reaching. The age-old conception of the crime of perjury would be gone. 18 U.S.C.A. § 1621. Any person who failed to tell the truth to the myriad of government investigators and representatives about any matter, regardless of how trivial, whether civil or criminal, which was within the jurisdiction of a department or agency of the United States, would be guilty of a crime punishable with greater severity than that of perjury."

\* \* \* \* \* \*

"An inquiry might be made of any citizen concerning criminal cases of a minor nature, or even of civil matters of little consequence, and if he wilfully falsified his statements, it would be a violation of this statute. It is inconceivable that Congress had any such intent when this portion of the statute was enacted. A literal construction of a statute is not to be resorted to when it would bring about absurd consequences, or flagrant injustices, or produce results not intended by Congress."

United States v. Davey (D.C.S.D.N.Y., 1957) 155 F.Supp. 175, had under consideration mere negative responses to questions by agents of the F.B.I., falsely made under oath, and it was there concluded that such negative responses did not constitute a "statement" within the meaning of the statute.

"But can it be said that when an accused person, a potential defendant, a suspect, grants an agent of the Federal Bureau of Investigation an interview and, in reply to an incriminating question, knowingly makes a negative answer, when truth and morality, but not the law, requires an affirmative reply, such answer perverts the authorized function of the Bureau? Is the authorized function of the Bureau to extract from the suspect only the truth, or, in view of the Fifth Amendment proscribing compulsory self-incrimination, to hear and record only such statement as the accused desires freely and voluntarily to make?"

The Davey case quotes with approval the rule of construction laid down by this Court with reference to § 1001 in United States v. Moore, 5 Cir., 1950, 185 F.2d 92:

"Under familiar canons of construction a penal act of the harshness and rigor of this one,—a harshness and rigor so great that, as the revisers point out in the notes to the Code as amended in 1948, the punishment was deliberately reduced from ten to five years—the statute will not be stretched beyond, it will be strictly confined within, the fair meaning of its terms."

United States v. Philippe, (D.C.S.D. N.Y., 1959) 173 F.Supp. 582, presents a situation in which the defendant uttered a false, oral denial of a suspected source of income to a special agent of the Internal Revenue Service. The Court concluded that the "statements" attributed to the defendant could not possibly pervert the authorized functions of the special agent or the department itself, which the statute was designed to protect.

"While the Special Agent may have been disappointed that defendant would not truthfully answer himself into a felony conviction, we fail to see that his investigative func-

tion was in any way perverted. The only possible effect of exculpatory denials however false, received from a suspect such as defendant is to stimulate the agent to carry out his function."

The most recent District Court case is United States v. Allen (D.C.S.D.Cal., 1961) 193 F.Supp. 954, in which the defendant was charged with having made false and fraudulent statements material to an inquiry being conducted by a special Federal Grand Jury, "an agency of the United States". Many of the cases are reviewed; and the opinion concluded as follows, citing Brandow v. United States, 9 Cir., 1959, 268 F.2d 559 and other cases:

"The conduct Congress intended to prevent by § 1001, is the willful submission to federal agencies of false statements calculated to induce agency reliance or action, irrespective of whether favorable agency action has actually resulted."

Brandow v. United States, 9 Cir., 1959, 268 F.2d 559, distinguishes the Levin case because no sworn statement was involved in Levin, but the opinion expressly declines to follow the reasoning in Levin or Stark; and prefers the reasoning of United States v. Van Valkenburg (1958) 157 F.Supp. 599, 17 Alaska 450 and Pitts v. United States, 9 Cir., 1959, 263 F.2d 353. Brandow is very different from the case we have for decision. In Brandow, the prosecution arose out of an investigation by the Internal Revenue Service of the activities of Ford, one of its former agents, Appellant Brandow, and an attorney. With respect to the activities of the three involved in connection with a matter pertaining to alleged income tax fraud, the defendant signed an affidavit in which he wilfully and knowingly made fraudulent and false statements and representations; and positively asserted that former agent Ford did not state directly or imply that he was willing to disclose the Government's case, and that he did not discuss the case with the defaulting taxpayers. This statement was false because Ford had disclosed the Government's case to Brandow and Brandow stated to the taxpayers that Ford was willing to disclose it to them. The court concluded that Appellant Brandow was under a legal obligation to give the information sought and that his statements were material and calculated to induce action or reliance by an agency of the Government. It should be observed that in Brandow the statement was apparently a deliberate, voluntary written statement under oath which did not constitute mere negative responses to questions. The statement related to the activities of a former agent of Internal Revenue, the appellant who was engaged in the business of an auditor, and Attorney Rau. It is difficult to see how there could be a case more suited to a prosecution under § 1001 than the Brandow case.

In Van Valkenburg, the defendant made a positive endeavor to have a third person charged with a federal crime, and for that purpose made the affirmative assertion to an Assistant United States Attorney that such person had stolen two (2) checks and had cashed them by means of forgery. This is likewise positive, deliberate, voluntary, aggressive action initiated by the defendant, and calculated to provoke a prosecution by Federal authorities. It is interesting to note that the Van Valkenburg opinion cites the Stark case as supporting authority. Also in the Pitts case, the defendant was in the employ of one who had made application for access to information on nuclear reactor technology, and while so employed wilfully, voluntarily and deliberately made a false statement on an Atomic Energy Commission personnel security questionnaire form. In Pitts, the defendant sought to retain his position by making a false statement with the obvious purpose of inducing the Atomic Energy Commission to act; and if he had not been apprehended, it is certain that he would have perverted the function of the questionnaire. The Pitts case is somewhat similar to the case of Marzani v.

United States (1948) 83 App.D.C. 78, 168 F.2d 133, affirmed by an equally divided court on appeal to the Supreme Court, 335 U.S. 895, 69 S.Ct. 299, 93 L. Ed. 431, (1948). In Marzani, the defendant applied to the Government for employment and affirmatively stated to representatives of the F.B.I. that he had never been a member of the Communist Party. Several years later he was informed that he would have to leave his position for security reasons. He sought an interview with a deputy assistant secretary in the State Department, and during this interview made the assertion that he was not, nor had he ever been, a member of the Communist Party. His action was aggressive, deliberate, positive and voluntary, and constituted an effort to pervert Government functions involving the welfare of the United States. His conduct and statements were designed to induce a decision to permit him to remain in the employ of the Government.

The cases of Knowles v. United States, 10 Cir., 1955, 224 F.2d 168 and Cohen v. United States, 9 Cir., 1953, 201 F.2d 386, relied on by the Government are also distinguishable. Both involved false, written net worth statements voluntarily and deliberately prepared and submitted by the defendants to Internal Revenue agents who were then and there making an investigation into the tax liability of each defendant. False net worth statements setting forth detailed facts and figures have a distinct potentiality for perversion, and are calculated to mislead those who review the statements. Such statements constitute affirmative, aggressive, voluntary, deliberate action and are definitely calculated to mislead, and to nullify the legitimate functions of Government. The case of Smith v. United States, 10 Cir., 1958, 257 F.2d 133, does not decide the point here involved. As pointed out in Philippe, the Smith case is distinguishable:

"On the facts it is indistinguishable from the present case. In fairness, however, we must state that the point was not raised for we have

sent for and examined the briefs and, parenthetically, Judge Pickett was not a member of the panel."

While we have not made a detailed review of every case in which the statute involved has been considered, we have given consideration to many of the leading cases. The opinions indicate some conflict in the reasoning employed by the various courts, but such apparent conflicts arise out of distinguishing facts rather than a fundamental interpretation of the statute. Our review of the legislative history of the statute and the purposes it seeks to accomplish lead us to the conclusion that in the circumstances and under the facts of the instant case, the reasoning of the courts in the Stark, Levin, Davey, Philippe and Allen cases and the principles there pronounced should be applied to the factual situation involving the appellant, Paternostro. The appellant in the case at bar made no statement relating to any claim on his behalf against the United States or an agency thereof; he was not seeking to obtain or retain any official position or employment in any agency or department of the Federal Government; and he did not aggressively and deliberately initiate any positive or affirmative statement calculated to pervert the legitimate functions of Government. At most, assuming that appellant's answers to the agent were proved to be false by believable and substantial evidence, considering all he said, the answers were mere negative responses to questions propounded to him by an investigating agent during a question and answer conference, not initiated by the appellant. We conclude that the court erred in failing to dismiss Count One of the indictment.

The appellant attacks Count Two of the indictment for failing to state the subject matter under investigation by the Grand Jury with respect to which the alleged false answers must be shown to be material. A perjury indictment under Title 18 U.S.C.A. § 1621 must contain the minimum allegations that the person charged was under an oath

authorized by the United States; taken before a competent tribunal or person; and that a false statement or statements were wilfully made as to facts material to the matter under inquiry or investigation. The indictment under consideration contained these elements, but the allegation as to materiality is in general terms. The early case of Markham v. United States, 160 U.S. 319, 16 S.Ct. 288, 40 L.Ed. 441 (1895), held that it was not necessary to set forth all the circumstances which render the false statement material to the matter in issue, and the simple averment that it was material will suffice. An examination of the record in this case convinces us that the defendant was fully apprised of the nature of the Grand Jury investigation. Both Counts One and Two relate substantially to the same matter and the false statements attributed to the appellant were substantially set forth in Count Two. We hold the indictment to be sufficient; Williams v. United States, 5 Cir., 1957, 239 F.2d 748.

■■ The appellant urges that the trial court committed error in denying a motion for a directed verdict of acquittal under Count Two of the indictment. This contention is based on the well established rule that in perjury cases the alleged false statements must be proved by the testimony of two independent witnesses, or by one witness plus independent corroborating evidence. Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945). Therefore, we must decide whether the Government met the required burden in undertaking to prove that the appellant received the so-called "graft money"; or had personal knowledge of or participated in an organized graft system while he was assigned to the Third District; or that he solicited any moneys from operators of an illegal business in the Sixth District (as limited by the prosecution's reply to appellant's motion for a Bill of Particulars).

We agree with the appellant that the Government failed to establish the allegations of Count Two of the indictment by the testimony of two independent witnesses or by the testimony of one witness plus independent corroborating evidence. The only witness who directly testified that the appellant knew of and participated in an organized graft system while in the Third District was former officer John Bray. While we have serious doubts as to the credibility of the testimony of Bray in view of the testimony of a number of witnesses that he had a bad reputation for truth and veracity, and a rather convincing showing by the record that Bray had testified to contradictory statements under oath in the state courts of Louisiana, before the city civil service commission and to various state and federal authorities, the jury apparently believed what he said. Accordingly, it is not for us to pass upon the credibility of Bray's testimony. That was the function of the jury. We conclude that even if Bray's testimony is accepted as true, he was not supported by the testimony of another witness nor was his testimony corroborated by other independent evidence.

■ The Government contends that witness Gervais corroborated the testimony of Bray, but we cannot agree. Gervais testified that he received graft money in brown envelopes such as described by Bray. We cannot agree with the Government's contention that Gervais testified that he heard the appellant make reference to the graft system. In substance, Gervais testified that as he was passing through a corridor in the police station he overheard "someone" in another room make the comment to the effect that "The Captains are getting the money.", or "The Captains are getting more money." Gervais would not state that the voice he heard was that of the appellant; and he stated that someone else in the room could have made the statement; that the statement was not necessarily related to graft money; and as a matter of fact, the person who made the statement could have been talking about the difference in the

respective salaries of Captains and Lieutenants. Bray is not corroborated by Gervais. We agree with the Government's contention that the corroborating evidence need not be sufficient to establish independent commission of the crime charged beyond a reasonable doubt or even by a preponderance of the evidence. We simply hold that the testimony of Gervais, measured by any reasonable standard, does not support the truth of Bray's testimony. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); McWhorter v. United States, 5 Cir., 1952, 193 F.2d 982.

With respect to the appellant's activities in the Sixth District, witness Evelyn Roberts Henderson, a self-confessed prostitute (at the time in question), testified that appellant had solicited protection money from her relating to a place of prostitution she then operated. No money was ever paid. She further stated that appellant had assured her that other businesses had "cooperated" with him and that he named Viola Vidrine as one who had cooperated. She claimed that she immediately related this incident to Captain Harris. Captain Harris promptly rejected and refuted her story. Assuming however that witness Henderson's story was true, we must decide whether it was sufficiently corroborated. To corroborate the story of witness Henderson, the Government points to the testimony of another self-confessed prostitute, Viola Vidrine. Witness Vidrine could not identify the appellant, although she claims that she had been arrested by an officer named "Pat" who solicited her for protection money. Again, no money was paid. The Government also presented the testimony of Policeman Lloyd Maestri through whom the Government introduced police records showing that the appellant had arrested Viola Vidrine on September 30, 1952. As to the records, it was admitted that the records presented showed only those who were arrested and fingerprinted. It was admitted that oftentimes persons were arrested and never brought to the office for fingerprinting. Witness Vidrine testified that the "Pat" who arrested her did so at her place on Baronne Street, while the record of the arrest on September 30, 1952, shows that she was arrested at her place on Dryades Street. Finally, witness Vidrine testified that the "Pat" who arrested her was in a police uniform; while Captain Harris, who admittedly was with appellant when Vidrine was arrested on September 30, 1952, testified that the appellant was wearing "plainclothes" at the time. Several other witnesses supported the statement that appellant was in civilian clothes on the night of September 30, 1952, when the arrest was made. Of more importance than any of the foregoing facts, is the fact that there was another police officer named Phillip Fritcher who was also known as "Pat". Under the testimony of record it seems more likely that the "Pat" to whom witness Vidrine referred could very well have been Patrolman "Pat" Fritcher who was admittedly a major participant in the organized graft system. As a matter of fact, the trial court was apparently confused about the two men named "Pat" during the testimony of witness Vidrine. The trial court was influenced to remark during the examination of witness Vidrine: "I don't think that the Government is suggesting that Pat is the defendant. Or are you suggesting that?" The question was never answered by the prosecutor or anyone else. There was testimony that Patrolman Pat Fritcher was always in uniform while on duty; whereas, officers of the rank of the appellant were permitted to make raids and arrests in civilian clothes. The testimony of Vidrine was vague, indefinite and uncertain. She never did connect the appellant with any solicitation of funds. Only by the wildest conjecture, surmise and suspicion could it be concluded that the "Pat" to whom she referred was the appellant. We are seriously doubtful that the testi-

mony of this witness had any probative force whatever.[5]

Other questions with reference to the receipt of evidence and other matters are called to our attention by the specifications of error and arguments of appellant and appellee. In view of the conclusions reached, we see no necessity of commenting on other questions presented. All of them are relatively minor.

■■ Considering all facets of the case, we believe it appropriate to affirm the principle set forth in United States v. Neff, 3 Cir., 1954, 212 F.2d 297:

"To sustain a conviction for perjury the evidence must be strong, clear, convincing and direct. Where the government seeks to establish perjury by the testimony of one witness and corroborating evidence, the latter must be independent of the former and inconsistent with the innocence of the defendant. 'When the courts speak of corroborative evidence they mean *evidence alieunde*

5. Following is typical of testimony of Viola Vidrine:

"BY MR. SMITH:

"Q What happened when Pat arrested you that time?

"A I went to jail.

"Q What happened after you got to jail?

"A I asked him to use the telephone, that I can remember, to get me bailed out.

"Q What happened then?

"A That is when we started talking.

"Q What did he ask you?

"MR. WHEELER: Objection. Who asked whom? That is our position, your Honor.

"THE COURT: She said 'Pat'. Pat, the policeman.

"MR. WHEELER: She has specifically stated that she cannot identify this defendant as being Pat.

"THE COURT: I don't think that the Government is suggesting that Pat is the defendant. Or, are you suggesting that?

"MR. WHEELER: I am sure that it is quite obvious, your Honor, that—

"MR. SMITH: She said she didn't know a person named Paternostro, but 'I've heard of him.' And, 'I knew a person named Pat who arrested me once.' And that is what I am pursuing.

"MR. WHEELER: But she doesn't say that that Pat that she is talking about is this defendant.

"MR. SEHRT: The witness said that she doesn't know this defendant.

"MR. WHEELER: Let's see if the Pat she is talking about is this defendant.

"THE COURT: Do you know the gentleman sitting at that table over there (indicating)? Can you see well?

"THE WITNESS: Yes, sir.

"THE COURT: Would you mind standing up (indicating the defendant)? (Whereupon, the defendant stood up.)

Do you know this gentleman? Have you seen him before?

"THE WITNESS: I think I have, while I was in jail, yes. But I don't know if it's him or not.

"THE COURT: You say you think you saw him while you were in jail?

"THE WITNESS: Yes, but I don't remember if it's him or not.

"THE COURT: Suppose you tell the jury the circumstances under which you saw him, and what happened?

"THE WITNESS: He was in uniform then, so I wouldn't know if it was him or not.

"THE COURT: Did you say anything to him, or did he say anything to you?

"THE WITNESS: That, I can't remember.

"THE COURT: Is he the Pat that you have been talking about, the policeman Pat?

"THE WITNESS: I don't know.

"THE COURT: What did you say?

"THE WITNESS: I say I wouldn't know.

"THE COURT: That you wouldn't know? Is it that you can't recognize him as the same one, or you can't be sure it is the same one?

"THE WITNESS: No, sir, because he was in uniform.

"BY MR. SMITH:

"Q Where did he arrest you?

"A At the place of business.

"Q Which place of business?

"A On Baronne.

"MR. WHEELER: If your Honor please, I ask that counsel say who arrested whom?

"BY MR. SMITH:

"Q Where did Pat arrest you?

"A On Baronne Street.

"THE COURT: Is the Government going to have other witnesses in connection with this matter?

"MR. SMITH: No, your Honor, this is the witness on this particular matter."

—evidence which tends to show the perjury independently.' "

Upon a review of the record as a whole, we conclude that the Government failed to carry the burden of proof required of it in a perjury prosecution. United States v. Hall (D.C.S.D.Ga., 1890) 44 F. 864, 10 L.R.A. 324; McWhorter v. United States, 5 Cir., 1952, 193 F.2d 982, 985.

 The case against the appellant under Count One turns entirely on the content of the statement to the Revenue Agent which is fixed and therefore beyond expansion, contradiction, alteration or repair. Therefore, since the deficiency in the Government's case cannot be met on re-trial, the case is reversed with directions to enter judgment of acquittal under Count One. Although it is assumed that the Government presented all the evidence it had under Count Two of the indictment, and so assuming it is difficult to see how any useful purpose would be served in remanding the case for a new trial under Count Two, we nevertheless reverse and remand as to Count Two solely because of the bare possibility that the Government may produce sufficient corroborating evidence if the District Court, in its discretion, considers another trial appropriate.

Reversed and remanded with directions.

On Petition for Rehearing.

PER CURIAM.

It is ordered that the petition for rehearing filed in the above entitled and numbered cause be, and the same is hereby Denied.

The appellee, United States, urges upon us the decision in United States v. McCue, 2 Cir. 1962, 301 F.2d 452, which the Government contends is in conflict with our decision in this case. While the McCue case was not cited in briefs nor discussed in our opinion, it was considered before the opinion was written. In view of the facts and circumstances involved, we do not consider the McCue case to be essentially in conflict with our opinion. Undoubtedly, the McCue case left open the question of the "exculpatory no" answer to the policeman. As therein stated:

"The case of the citizen who replies to the policeman with an 'exculpatory no' can be left until it arises. See United States v. Davey, 155 F.Supp. 175 (S.D.N.Y.1957); United States v. Stark, 131 F.Supp. 190 (D.Md.1955). It is sufficient for the present to point out that the case at bar bears no resemblance to such a situation."

 It is our feeling that the "exculpatory no" answer without any affirmative, aggressive or overt misstatement on the part of the defendant does not come within the scope of the statute, 18 U.S.C.A. § 1001. Whether the Government agent to whom the answer is given be an agent of the F.B.I., a "policeman", or an Internal Revenue agent, is of little consequence. The same rule should apply to all "policemen", and therefore we cannot approve one rule for one type of agent and another rule for an agent of another department of the same Government.

Under the facts and in the circumstances of this case, the Internal Revenue agent who initiated the interview was performing essentially the functions of a "policeman" or investigative agent for the Government. The statement attributed to the defendant Paternostro is unquestionably an "exculpatory no".